20-63-48 United States of America v. Lorenzo Shelton. Oral argument not to exceed 15 minutes per side. Mr. I don't want to mess up your last name counsel. What how do you pronounce your last name? Mr. Stryance for the defendant appellant. Good morning. Good morning. Peter Stryance of the Bar of the Middle District of Tennessee here on behalf of defendant appellant Lorenzo Shelton and we're respectfully asking this panel to reverse the district court's denial of Mr. Shelton's motion to suppress two successive parole searches. So this is another one of those thorny parole search cases that's coming before the court. I know the court's read the briefs and are familiar but I wanted to highlight just a few things in terms of the timeline. October 26 of 2015 Mr. Shelton was released from a state prison Morgan County Correctional Complex in East Tennessee and he was hustled into a room and before he could leave the premises he was required to sign a parole certificate which was an exhibit to my original motion to compare to other cases and other parole certifications from other jurisdictions but in Tennessee it reads like this or read like this in 2015. I agree to a search without a warrant of my person vehicle property or place of residence singular by any probation parole officer or law enforcement officer at any time without reasonable suspicion. Significantly in 2015 and I don't know if they've updated it because I've not not looked at one but there was no fourth amendment waiver embedded in the parole certificate. There was no Miranda or fifth amendment waiver that was embedded in the Tennessee certificate and using the language of the cases it certainly the Tennessee certificate did not unambiguously include cell phones or stored communications and I think that the court is aware that the subsequent search of Chesapeake Drive was occasioned by what I've characterized as a warrantless search of Mr. Shelton's cell phone when he after he was initially summoned to his mother's home at 317 Tillman Lane which as of July 11th of 2016 that was the only residence that was on file with the Tennessee Department of Correction. Well if we start with the Tillman search. Yes. I mean your client signed a waiver where it said you know you don't have to have any suspicion and I guess as a first question I mean my understanding is that Tennessee law allows parole searches with that kind of waiver so long as there isn't an improper purpose for the search so long as it's not personal animosity or something. Exactly. And so okay so we're common ground there it's your burden to show that there was such an improper purpose right? Yes sir. And so what affirmative evidence you know I mean they don't have to show probable cause or something like that in order to avoid a determination of improper purpose so what do you have I mean there's no evidence of animosity anything personal I'm struggling to see any evidence of an improper reason why based on a you know in his backyard that this thing was improper at Tillman. I think the only argument that I can candidly make to the court about the first parole search at his mother's home at 317 Tillman is that Stanfield a case that was decided by the Tennessee Supreme Court about 20 days after I filed my initial motion to suppress did hold open the question that a warrantless suspicion search of a parolee's home could still be invalid and you Judge Keflich talked about personal animosity there's animosity but not personal animosity on part of the parole officer here but it also says inherently suspect suspicionless searches. So it strikes me that a telephone call is made to the Tennessee Department of Probation and Parole on July 28th of 2016 about a week before this search an anonymous female is complaining that Mr. Shelton is not working at Ed's fish house in North Nashville that that's all a sham and that he has come up with some false pay stubs. Now at that point the parole officer assigned to Mr. Shelton could have easily determined whether his employment status was a sham. He could have driven to North Nashville to the fish house and seen if if Mr. Shelton was actually employed there or he could have picked up the telephone but instead he launched decides to launch through his own analysis of this situation that Mr. Shelton is then and there in the summer of 2016 actively engaged in drug trafficking and that seems to me to be an unreasonable conclusion by the parole officer. You know under Tennessee law can the parole officer, I think the answer is yes, but can the parole officer simply of his own volition at any time go to the premises of a parolee who's given a certain address here at Tillman and conduct a warrantless search? I mean so he can do that irrespective of of this anonymous phone call right? He certainly can. I mean do that lawfully. But but but the thing that's troubling in this case is the concerted activity between the Tennessee Department of Probation and Parole and the Metro Nashville Police Department. I think it's a fair characterization that the police department was availing themselves that day of this sort of carte blanche parole search that was being conducted and I think it's from from the record I think it's fair to characterize that these Tennessee parole officers are not like your grandfather's probation or parole officer. They are really an arm of law enforcement. They've certainly changed their regime. There's no social work stripe with these parole officers. They now like to dress as police. They have badges. They have utility belts. They all carry guns. They have marked patrol cars and they love acting like they are the police. And the line gets blurred when they call the Metro Nashville Police Department to assist them because ironically they can search till their heart's content but they can't ever seize any items. They can't seize drugs. They can't seize. And they did call the Metro Police in this case. And I think the Metro Police really took advantage of the situation particularly on the subsequent search of Chesapeake Drive. Why don't we move on to that because your time is running. Yes. We'll move to Chesapeake. That's really the most troubling part of this whole episode in terms of the Chesapeake Drive subsequent search. I think it's clear that they didn't know if he lived at the address on Chesapeake Drive. They had a fragment that they and they go over to Chesapeake Drive. Didn't he, didn't Mr. Shelton say he lived over on Chesapeake? Didn't have the address that has some, address has some threes in it or something like that. Didn't have the exact address. I thought he had indicated to the parole officer that he actually lived over. That when he was confronted by Mr. Pascoletto, his parole officer over at But I think it's interesting the way that they reacted to that information. They go over to Chesapeake Drive and conduct a law enforcement technique as the court is aware of. A knock and talk to confirm that that is where Lorenzo Shelton may have a connection where he may be staying. And the problem with the subsequent search is that the language is very clear in the parole certificate. His residence. They had settled on his residence being 317 Tillman to satisfy what you Judge Cole just articulated. They could go to Tillman Drive all day every day and search without a warrant. Can a parolee only have like just one residence? I mean is there authority that would suggest you can't have two? Well they're supposed to report one resident. They reported Tillman. I know that. 14 days at one place, 14 at another each month. Well that's not what they had in their records. I know but theoretically. I mean why would, in other words, why wouldn't, you know, why can't there be two residences? Sometimes that's the fact of the matter. Well I think what they knew that morning, August the 4th, was that his reported residence was his mother's residence, 317 Tillman. No parole officer had ever gone consistent with their regulations to the mother's residence to see if it was a suitable location. They certainly never went over to the Chesapeake Drive. But here's the most troubling point. The Metro Police Department basically gases up these parole officers. Why don't you all go over to Chesapeake Drive and do a knock and talk and see if you can determine if that is Lorenzo Shelton's residence? They were engaged in a full-blown... What's wrong with that? Well nothing wrong with if they get a search warrant. Well not necessarily. I mean we're not, you know, we're in different territory with a parolee. Not even a probationer, right, is parolee. Basically almost treated like he's still in prison but has certain liberties not to be in prison. But, and I understand that completely about Tillman, but there is a break in that chain where you've got law enforcement, the Metro Nashville Police Department, working in concert with these parole officers who basically want them to do their work for them. Hey go do a knock and talk and we're going to do a warrantless, a parole search at this subsequent location. And the language of the parole certificate doesn't contemplate that. And if they wanted to get a search warrant, if they felt like they had enough information that they had gathered that morning to put in an affidavit and present it to a neutral and detached magistrate, that's what they should have done. They should have gotten a warrant. So you were going to address the cell phone and see your time is running short, but there was this incomplete typed text, as I recall it, in the cell phone from Mr. Shelton. I think the inference is that he was suggesting that certain things be removed from property. But that would have related to the first search over at Tillman. The testimony at the at the evidentiary hearing and I think even at the trial was that that text was directed to Tez, LeTez Murphy, his first cousin, who is the one who showed up at the trial significantly impaired. Okay, well I'll see what the government thinks about that. Thank you. Thank you and may it please the court. Joel Johnson on behalf of the United States. As a parolee, Shelton's privacy interests were significantly diminished, yet the government had a strong interest in supervising him to detect criminal activity that would hinder his successful reintegration into society. In light of those asymmetrical interests, each of the parole searches at issue in this case was lawful under the Fourth Amendment. Starting where we left off, on the cell phone, the cell phone search did not violate the Fourth Amendment for two independent reasons. First, it was a lawful parole search under the conditions of parole that Shelton agreed to. And second, there's a narrower ground and that is that the information obtained from the cell phone that actually led to the Chesapeake address was not a product of any cell phone data search. Rather, it was the phone number that appeared unprompted repeatedly on the screen while the phone was in the lawful possession of the officers. And turning to the Chesapeake home search, that search, as the district court pointed out, was not a violation of the Fourth Amendment. First, because Shelton lacked standing to challenge it. And then second, there was probable cause on the part of the officers that the residence at Chesapeake was his residence at the moment that the search was conducted. We're not, we're not talking about Article 3 standing here, are we? No, Fourth Amendment standing. So basically, the inquiry is whether Shelton had a legitimate expectation. In other words, this doesn't go to our power to adjudicate the merits of the issue. That's exactly right. It just goes to the defendant's ability to challenge a search in a particular location. And as the district court concluded during the suppression hearing, Shelton failed to establish a legitimate expectation of privacy at the Chesapeake home. Because it wasn't his residence, right? They said, I mean, the court said this was just like business only, keeping the items in that locked room. Because all that was found were items related to drug trafficking. And using a space just for drug trafficking purposes is not sufficient to establish that you were an overnight guest somewhere. So, I mean, the district court, correct me if I'm wrong, finds that he had just a business kind of relationship with the Chesapeake resident address and that it's not his residence. So I don't, I don't, I don't read the district court. If it was his residence, he'd have standing. I mean, it's, isn't it just like pretty clear that? Yes, yes. I'm not sure the district court specifically said it was not his residence, but I think he said it was business only or something. That's the implication of. And so that's after the fact, that's after an evidentiary hearing, but we have a, I think it's fair to say that we basically have a determination that he did not live at Chesapeake. And, and yet, I mean, so you, you know, we have this sort of, you know, tension in this case where two addresses are searched on the, on the premise, on the ground that they are Shelton's residence. Fair? Correct. And so, and one of them turns out is not his residence, at least as found by the district court. And so how do you explain the propriety of searches of two residences when one of them the district court said was not, had two addresses when one the district court said is not his residence? Sure. Well, the district court's conclusion, as you alluded to, Judge Kethledge, was with the benefit of the suppression hearing and all of the evidence. And the question for probable cause as to the specific residence was during the unfolding investigation, what would a reasonable officer think? And in that inquiry, there, there was evidence at the time of the search of the Chesapeake home that, that this was, in fact, his residence rather than the Tillman home. At that, at that point, Shelton had said he lived on Chesapeake or that he was staying at Chesapeake. And then when they arrived, the woman at the door said that he had been staying there two weeks. And there was the, the number that repeatedly called and sent messages to the cell phone that was associated with that same address. So, I mean, there could be probable cause for the officers to think that both addresses were his residence. Is there an argument that probable cause as to the Tillman residence dissipates when they get there? He's not there. He's somewhere. I mean, does probable cause for the first address sort of dissipate to the extent that they start to think, actually, he lives at Chesapeake and let's go search that? Not at least at the moment of the Tillman home. Perhaps by the time they got to the Chesapeake home, if they truly believed the woman who was at the door saying he had stayed there for two weeks, then perhaps at that moment, it would have dissipated. But of course, the Tillman search had already occurred at that point. And when that search was conducted, they were relying on Shelton's own representation that he lived on the Tillman, Tillman home, which he represented to his parole officer. Okay. Yeah, you do have that. In turning back to the cell phone, I would point out in the briefing, there's this argument that Riley applies in this parole context. I would just point out again, as we said in our brief, that Riley's rationale was limited to the search incident to arrest context. In fact, it expressly limited it to that context. And no court of appeals that has addressed this issue has extended Riley to parole search context. And the Seventh Circuit's recent opinion in Wood, which we identified in our 28J letter, specifically arises in this context and declines to extend Riley. Unless there are any other questions, we're content to rest on our briefs. And we would ask that the court affirm the judgment of the district court. Just one question. I guess this really hasn't been raised, but I was going to ask about the issue of Mr. Shelton possibly being an overnight guest at Chesapeake Bay. And I realized that the only items found in that particular, particular locked room were items that I think relate to a business, illegal business activity. But what about the argument that he may have been an overnight guest? And maybe I've answered that question in asking it. Yeah, so I think the district court could have exercised its discretion to reach that conclusion based on the out-of-court statements that Shelton made first, that he was staying at the Chesapeake home, and then that the woman said that he was staying there. But importantly, those were out-of-court statements at the suppression hearing, and the district court found them to be not reliable. And so we think there's no basis in the record that was before the district court at the suppression hearing to reach that conclusion. I guess just to recap as to the Chesapeake address, I mean, what would you point to in particular in the record to support the district court's determination that there was probable cause to think that his residence was Chesapeake? I mean, just because somebody is there at seven in the morning presumably doesn't give rise to probable cause. The Chesapeake home or the Tillman home? The Chesapeake home? Chesapeake, yeah. So he says Tillman. They go to Tillman. He's not there. Turns out he's at Chesapeake. Just the fact that he's not, you know, that he's there at seven in the morning, I don't think is going to be enough for probable cause. So if you could just itemize sort of what you think does support a determination that Chesapeake was, they had probable cause as to Chesapeake. Of course, the district court never reached that because it resolved the issue on the standing ground. But what we would point to on the probable cause point is first his own statement. So Shelton says, I'm no longer living at Tillman, and to a reasonable officer in the moment, they could believe that that was a true statement. So does he say that in the phone call? Is that where that comes in? No, so on site at the Tillman home. They're about to search the Tillman home, and he voluntarily says, I'm now staying at a he has said that each of these is his residence, and that's probably his biggest problem on this issue. That's correct, and so that was the first piece of evidence. The second would be then that number that keeps calling the cell phone, which is associated with a specific address on Chesapeake. Then they go to that address, and a woman at the address corroborates Shelton's prior testimony that he's, not testimony, prior statement that he had been staying there two weeks. I mean, so those three things in particular we think establish the probable cause. Am I right that the parole officers did do some search of the contents of the cell phone? And I guess my question is, you know, what supports the lawfulness of that search? I know there's some discussion of the Fletcher case and some others. So there was a search to some extent of the cell phone, right? There was a search of, I believe, photos and text messages on the cell phone. The point I was making before was simply that the information obtained from the cell phone that actually had any connection to Chesapeake was just the call coming in, and so we think the court doesn't need to reach that broader question about the lawfulness of a cell phone search in the parolee context, but if it does, we think it should follow the Ninth Circuit's decision in to the parolee context. Thank you. Okay, thank you. Thanks. Mr. Strayance? The warrantless search of Mr. Shelton's phone as he sat on the stoop of 317 Tillman Lane is where they got the address for Chesapeake Drive. Was it lawful for them to take the phone out of his hands when he's texting? Absolutely not. Why wouldn't it be? I mean, why isn't that a danger to the officers? Maybe he's texting for somebody to sort of, you know, come and violent to get him out of there. There were 11 officers that were there. There were five probation officers and four, I think six police officers there at the time. Is there any, well, or he could be saying destroy evidence, and presumably that would be a legitimate thing to stop. Well. I mean, is there any case law that says in these circumstances an officer has to allow a detained person to continue texting to grab the phone? I know, but is there any case law that says you have to keep letting him text on his phone, you know? No, I mean, factually, they didn't let him continue to text. So the answer, there's no case law. I'm just asking about the case law. I don't know of any case laws. I stand here right now, but the way that it developed, they had taken the phone from him. There was no exigent circumstances at that point in time. He was clearly in their custody, and they could have gotten a search warrant to search the phone, but they did a warrantless search based on what they claim is in the Tennessee parole certificate. And taking a look at the Tennessee parole certificate, it says person, vehicle, property, place of residence, singular. And I think that the Tennessee parole certificate is narrower than the Ohio certificate in Fletcher. Fletcher may search the person, another item of tangible or intangible personal property. And the Sixth Circuit reversed the search question in Fletcher. And under that Ohio revised code statute 2951.02a, they don't distinguish between probationers and parolees. The government relies on the Seventh Circuit case in Wood. Mr. Wood had already violated his supervision, and there was an arrest warrant for him. And if a careful reading of the ignoring and leaving out the language that Judge Stranch relied on, the crucial language that comes from the Ohio revised code, quote, tangible and intangible personal property. So they distinguish the case, but don't ever mention this distinction between tangible and intangible property. Okay. Well, thank you, Mr. Strauss and Mr. Johnson, both of you for your briefing and your arguments today. We really do appreciate them. We'll take the case under submission. And Roy, you may call the final case that's being argued today.